## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## AT COVINGTON

| | |
|---|---|
| JEFFREY S. MOORE, individually and on behalf of a class of similarly situated individuals,<br><br>       PLAINTIFF,<br><br>vs.<br><br>CASHCALL, INC.,<br>WS FUNDING, LLC,<br>DELBERT SERVICE CORPORATION,<br>and JOHN PAUL REDDAM,<br><br>       DEFENDANTS. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Now comes Plaintiff Jeffrey S. Moore, by counsel, and for his Complaint against Defendants CashCall, Inc., ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Service Corporation ("Delbert"), and John Paul Reddam ("Reddam"), (collectively, "Defendants"), states as follows:

## I. <u>INTRODUCTION</u>

1.     This is an action for damages and injunctive relief against Defendants CashCall, WS Funding, Delbert, and Reddam arising from offering, funding, servicing and collecting on fraudulent and illegal consumer loans made to Kentucky borrowers.

2.     CashCall, WS Funding, and Delbert are affiliated companies that make, fund, purchase, service, and collect on illegal loans to Kentucky consumers that accrue interest at rates far in excess of those allowed under Kentucky law.  These Defendants seek to evade the Commonwealth of Kentucky's licensure and laws by using as a front an unrelated fourth company, Western Sky Financial, LLC ("Western Sky").  Western Sky

has falsely held itself out as an Indian tribal entity that purported to be exempt from state and federal laws under the doctrine of tribal sovereign immunity.  Western Sky is actually a for-profit South Dakota company.  Western Sky is owned by an individual who happens to be a member of an Indian tribe.  Western Sky is not owned or operated by any Indian tribe or for the benefit of any tribe; therefore, the doctrine of tribal sovereign immunity does not apply to the loans made to Kentucky borrowers.  These loans made by Defendants utilizing Western Sky as a pass-through for their illegal loan scheme are referred to herein at the "Western Sky loans."

3.    Western Sky was nothing more than a pass-through for loans advertised, underwritten, funded, serviced, and collected by Defendants.

4.    CashCall is the real or "*de facto*" lender in these loan transactions, and it controls virtually all aspects of the transactions.  Pursuant to its arrangement with Western Sky, among other activities, CashCall, itself or through subsidiaries, creates and distributes advertising materials for the loans; reviews all loan applications for underwriting requirements; funds the loans; assumes all risk of loss on the loans; receives all payments on the loans; services the loans; and indemnifies Western Sky for all costs and any liability associated with the loans.

5.    Based on these facts, regulators and courts have concluded that "Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."  *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc. and WS Funding, LLC,* State of New Hampshire Banking Department, Case No.: 12-308 (June 4, 2013).

6.     Since 2010, at least fourteen states have taken action against Defendants for unlawfully making loans without proper state licensure and in violation of state usury and consumer protection laws.

7.     Plaintiff brings this claim on his own behalf, and also, on behalf of a Class of all persons who obtained "Western Sky" loans in Kentucky, to recover all amounts collected by the Defendants and for damages, attorneys' fees, and such other relief as allowed by law. Plaintiff also seeks declaratory and injunctive relief including a declaration that the loans are void, and for refunds.

## II.  PARTIES

8.     Plaintiff is a resident of Boone County, Kentucky.  Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

9.     CashCall is a for-profit California corporation with a principal place of business at 1600 South Douglass Road, Anaheim, California 92806.   CashCall is engaged in the business of offering, making, purchasing, servicing, and collecting on consumer loans.  CashCall is authorized to do business in Kentucky and is a corporation in good standing in Kentucky.  CashCall has made mortgage loans in Kentucky but has no active licenses now.  CashCall does not hold any other license issued by the Kentucky Department of Financial Institutions and does not hold a license to make consumer loans in Kentucky.  CashCall is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

10.     WS Funding is a for-profit Delaware limited liability company and is a wholly-owned subsidiary of CashCall.  WS Funding has a principal place of business at 1600 South Douglass Road, Anaheim, California 92806, the same office address as CashCall.  WS Funding does not hold any license issued by the Kentucky Department of Financial Institutions.

3

11.     Delbert is a Nevada corporation with places of business located at 7125 Pollock Drive, Las Vegas, Nevada 89119 and at 1600 South Douglass Road, Anaheim, California 92806, the same office address as CashCall.  Delbert is engaged in the business of purchasing, servicing, and collecting on consumer loans made by CashCall; and Delbert currently holds and/or services loans made to Kentucky borrowers by CashCall and WS Funding using Western Sky's name.  Delbert does not hold any license issued by the Kentucky Department of Financial Institutions. Delbert is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

12.     John Paul Reddam is a resident of California.  At all times relevant herein, Reddam is and was the sole owner and shareholder, President, and Chief Executive Officer of CashCall; the President and sole member, manager, and owner of WS Funding; and the Director and owner of Delbert.  At all times relevant herein, Reddam directed, controlled, and had managerial responsibility for the activities of CashCall, WS Funding, and Delbert, including the unlawful practices alleged herein. Reddam is the President and Director of CashCall, a corporation authorized to do business in Kentucky since 2003.

### III.  JURISDICTION AND VENUE

13.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum value of $5,000,000.00 and is a class action in which members of the Class are citizens of a state different from Defendants.

14.     The Court also has jurisdiction due to a federal question in light of the Plaintiff's claim under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that many of the acts and transactions giving rise to this action occurred in this District in that Defendants conduct business in this District and have intentionally availed themselves of the markets within this District through the promotion, marketing, extension of credit, funding of loans, and collection of loans in this District.

## IV.  <u>FACTS</u>

**A.    "Western Sky" advertises loans in the Commonwealth then finalized those loans without any connection to the Sioux Tribe.**

16.    For several years Defendants regularly offered, made, and collected on illegal, unsecured loans to Kentucky consumers.  Defendants have promoted these consumer loans through Western Sky's website, www.westernsky.com, and through national television advertising broadcast in Kentucky in the name of Western Sky.  In fact, CashCall and Reddam established and controlled the Western Sky website.

17.    The Western Sky website offered Kentucky consumers personal loans ranging in amounts from $850 to $10,000.  On these loans Defendants have charged Kentucky consumers interest rates from at least 89% to over 200% per annum.  In addition to these exorbitant rates of interest, borrowers are charged loan origination fees from $75 to $500, which are added to the loan principal.  The loan agreements require borrowers to re-pay the loans in monthly installments, with re-payment periods ranging from twelve (12) to eighty-four (84) months.  Below is a chart from the website established and maintained by CashCall using the Western Sky name as it existed on October 26, 2011, setting forth the loan amounts and rates offered to consumers:[1]

---

[1] See, https://web.archive.org/web/20111026212652/http://www.westernsky.com/General/Rates.aspx.

| Loan Product | Borrower Proceeds | Loan Fee | APR | Number of Payments | Payment Amount |
|---|---|---|---|---|---|
| $5,075 Loan | $5,000 | $75 | 116.73% | 84 | $486.58 |
| $2,600 Loan | $2,525 | $75 | 139.22% | 47 | $294.46 |
| $1,500 Loan | $1,000 | $500 | 234.25% | 24 | $198.19 |

18. To obtain the loans, consumers are invited to submit an on-line application through Western Sky's internet website or to call an advertised toll-free telephone number to apply. Western Sky communicates its approval or denial of the borrower's loan application by internet or by phone. Loan decisions were made off the reservation. Once approved, loan funds are electronically disbursed to consumers' bank accounts. Under the loan agreements, Kentucky consumers are required to authorize that their monthly payments be electronically debited from their bank accounts.

19. CashCall made loans to borrowers outside of South Dakota through advertising intended to reach potential borrowers who resided off the reservation and outside of South Dakota. The borrowers were not members of the Sioux Tribe. During the entirety of a loan transaction and the relationships between borrowers and these companies, the borrowers were located off the reservation and outside of South Dakota. All communications between CashCall and borrowers occurred through the mail or over the telephone or internet.

20. After a consumer executes a loan agreement, the loan is by agreement with CashCall, immediately transferred to CashCall or WS Funding. Consumers are then informed that the loans will be serviced by CashCall. In some instances, WS Funding or CashCall have subsequently sold or transferred the loans to Delbert, an affiliate of CashCall, for servicing and collections.

21. Kentucky consumers never make loan payments to Western Sky. Instead, CashCall and its affiliates, including Delbert, collect all payments on the loans, service the loans, and handle all communications with borrowers regarding the loans.

**B.  Defendants' use of the Western Sky name is a sham.**

22. In a cease and desist order issued by the New Hampshire Banking Department to Defendants CashCall, WS Funding, and Reddam, the Banking Commissioner laid bare the Defendants' arrangement with Western Sky and concluded, under both the facts and the law, that the arrangement is a subterfuge used by the Defendants to make illegal loans and usurp state lending laws.  *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc. and WS Funding, LLC.,* Case No.: 12-308 (June 4, 2013).

23. The New Hampshire Banking Commissioner's Order followed an examination of the contractual agreements between CashCall, WS Funding, and Western Sky and other documents relating to CashCall's relationship with Western Sky. The Commissioner's findings show that CashCall has the predominant economic interest in the loans purportedly originated by Western Sky, and that CashCall controls virtually all aspects of the lending process.

24. Among other determinations, the New Hampshire Banking Commissioner made the following findings of fact:

> a.  CashCall creates all advertising and marketing materials for Western Sky;
>
> b.  CashCall provides website hosting and support services for Western Sky;
>
> c.  CashCall reimburses Western Sky for all costs of maintenance, repair and/or update costs associated with Western Sky's server;

d.      CashCall reimburses Western Sky for its office, personnel, and postage, and provides Western Sky with a toll free telephone and fax number;

e.      Once a consumer applies for a loan, CashCall reviews the application for underwriting requirements;

f.      Once a loan application is approved, Western Sky executes a promissory note and debits a so-called "Reserve Account" to fund the promissory note;

g.      CashCall is required to set up, fund, and maintain the balance in this Reserve Account;

h.      After a loan is funded, CashCall is obligated to purchase the promissory note from Western Sky;

i.      CashCall bears all risk of loss on the loans;

j.      CashCall generally makes contact with the consumer within one business day of the consumer filing an application for the loan and once the loan has been made;

k.      Western Sky accepts no payments from consumers on the loans;

l.      CashCall services the loans;

m.      CashCall is responsible for tracking all consumer complaints regarding the loans;

n.      CashCall has agreed to indemnify Western Sky for all costs arising or resulting from any and all civil, criminal or administrative claims or actions relating to the loans, including but not limited to fines, costs, assessments, and/or penalties which may arise in any jurisdiction;

o.      As compensation for services provided, Western Sky pays CashCall 2.02% of the face value of each approved and executed loan transaction plus any additional charges, with a net minimum payment of $100,000 per month; and,

p.      CashCall pays Western Sky 5.145% of the face value of each approved and executed loan credit extension and/or renewal, as well as a minimum monthly administration fee of $10,000.

25.     The New Hampshire Banking Commissioner further found that CashCall, WS Funding, and Reddam "have taken substantial steps to conceal this business scheme

8

from consumers and state and federal regulators," and that Defendants' scheme "prevents consumers from understanding which entity is making the loans." Additionally, the Commissioner found:

> a.    Western Sky does not identify its relationship with CashCall or WS Funding on its website or in any marketing materials;
>
> b.    The promissory notes identify the lender as Western Sky with an address of Timber Lake, South Dakota; and,
>
> c.    The promissory notes state that the loan agreement is "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation."

26.    Based upon this in-depth review, the New Hampshire Banking Commissioner concluded: "[I]t appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."  The Commissioner ordered CashCall, WS Funding, and Reddam to cease and desist from their unlawful lending activities, including making further loans through Western Sky or collecting on existing loans.  The Commissioner further ordered CashCall, WS Funding, and Reddam to pay restitution to all New Hampshire borrowers, and assessed an administrative fine against them in the amount of $1,967,500 for knowingly making illegal loans to 787 New Hampshire borrowers.

27.    In all substantive respects, CashCall, through and in conjunction with its wholly-owned subsidiary WS Funding, is engaged in the business of lending, and is the actual or *de facto* lender and the real party in interest to the loan transactions with Kentucky consumers.

28.    In late 2009, through its subsidiary WS Funding, CashCall and Western Sky entered into agreements for the assignment and purchase of promissory notes.  In

this agreements, Western Sky assigned all of its loans "on a daily basis" to WS Funding. As consideration, WS Funding paid Western Sky monthly fee of approximately $110,000 and agreed to reimburse Western Sky for all costs of maintenance, repair and/or update costs associated with its computer server.  CashCall funded a "Reserve Account" at levels sufficient to cover the value of the purchased notes.  In addition, CashCall was responsible for all collection efforts on the loans and indemnified Western Sky for any civil or criminal claims.

## C.  The arbitration agreement made part of the Western Sky Consumer Loan Agreement is fraudulent and unenforceable.

29.    Defendants purport to obligate every borrower to a "Western Sky Consumer Loan Agreement" ("Loan Agreement").  The Loan Agreement contains an arbitration provision that seeks to obligate consumers to a scheme that is intended to leave them with no dispute resolution process and no remedy.

30.    The Loan Agreement repeatedly rejects all federal and state law and instead selects the jurisdiction and laws of the Cheyenne River Sioux Tribe ("Sioux Tribe") as the sole governing authority.  For example, the Loan Agreement states:

> a.    **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**  By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.

> b.    TRUTH IN LENDING DISCLOSURES:  The disclosures below are provided to you so that you may compare the cost of this loan to other loan products you might obtain in the United States.  Our inclusion of these disclosures does not mean that we consent to application of state or federal law to us, to the loan, or this Loan Agreement.

c. **E-SIGN/ELECTRONIC COMMUNICATIONS**. Although federal law does not apply this this Agreement, this Note is in original format an electronic document fully compliant with the Electronic Signatures in Global and National Commerce Act (E-SIGN) and other applicable laws and regulations, and the one, true original Note is retained electronically by us.

d. **GOVERNING LAW**. This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America. By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation. You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement.

e. **Agreement to Arbitrate**. You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

f. Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Cheyenne River Sioux Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement.

g. The validity, effect, and enforceability of this waiver of class action lawsuit and class-wide Arbitration is to be determined solely by a court of competent jurisdiction located within the Cheyenne Rivers Sioux Tribal Nation, and not by the arbitrator. If the court refuses to enforce the class-wide Arbitration waiver, or if the arbitrator fails or refuses to enforce the waiver of class-wide Arbitration, the parties agree that the Dispute will proceed in tribal court and will be decided by a tribal court judge, sitting without a jury, under applicable court rules and procedures.

h. **Applicable Law and Judicial Review**. THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE

> CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement.

31.     The Loan Agreement disavows state and federal law so that Defendants can charge Plaintiff interest of 89% per annum to borrow $10,000 to be repaid over 84 months for total payments of $62,650.94.

32.     Defendants also purport to commit consumers to an arbitration provision contained within the Loan Agreement. The arbitration provision itself is fraudulent and unconscionable in that it purports to set up a fair dispute resolution process. In fact, the arbitration provision touts a process that does not exist and which could not provide a remedy under any circumstances for citizens of Kentucky.

33.     The arbitration provision purports to establish an affordable means to redress consumer disputes related to the Loan Agreement. The arbitration provision recites:

    a.     Arbitration will be conducted by an "authorized representative" of "the Cheyenne River Sioux Tribal Nation" and "in accordance with its consumer dispute rules."

    b.     The consumer can select either the American Arbitration Association ("AAA") or JAMS to "administer" the arbitration.

    c.     The arbitration can take place within thirty miles of the consumer's residence.

    d.     Defendants will pay the filing fee and the fees of the arbitrator.

34.     However, the arbitration provision itself is a sham and is fraudulent and unconscionable. Despite the seemingly favorable recitals in the arbitration provision, it also obligates the consumer to a process that does not exist and which cannot provide a remedy. For example:

a.   By disclaiming and disavowing the application of either federal or state law to the Loan Agreement, Defendants have attempted to eliminate all statutory and common law claims and remedies under federal and state law.

b.   The Sioux Tribe has no arbitration laws, no arbitration process, and no "consumer dispute rules."   Defendants have obligated consumers to a process that does not exist.

c.   The arbitration provision requires that the arbitration be "conducted by" an "authorized representative" of the Sioux Tribe. However, there are no Sioux Tribe arbitrators and no "authorized representatives" that can conduct the arbitration.

d.   Allowing the consumer to select AAA or JAMS to "administer" the arbitration does not cure the illusory process.   While private companies like AAA and JAMS can administer arbitrations, only arbitrators conduct them.  Here, the arbitration is to be conducted by arbitrators that do not exist.

e.   Once concluded, the arbitration provision of the Loan Agreement requires confirmation of the arbitration award in the Cheyenne River Sioux Tribal Court.[2]  However, even if Trial Law provided for the confirmation of arbitration awards, enforcement of that award is not certain.  Judgments of Tribal Courts are not entitled to Full Faith and Credit in states crucial to this matter.  Additionally, the Cheyenne River Sioux Tribal Court lacks personal jurisdiction over the parties and thus cannot enter a binding judgment confirming any arbitration award.

35.   The choice of law in the Loan Agreement and the chosen arbitrator and arbitral forum in the arbitration provision, and the forum for registration and enforcement of any arbitration award are integral to the agreement.   Defendants obviously intended to do nothing more than frustrate consumer's efforts to obtain redress for any claim against them.

36.   Defendants also have incorporated delegation language in the arbitration provision which purports to leave to the arbitrator the ultimate decision on whether the

---

[2] Section 9 of the Federal Arbitration Act permits the selection of the jurisdiction for confirmation of the award.  9 U.S.C. §9.

arbitration agreement is valid, enforceable, illegal, or unconscionable.  The delegation

provision is itself invalid, unenforceable, and unconscionable:

      a.     By selecting an authorized representative of the tribe and a separate arbitration administrator and leaving questions of arbitrability to the arbitrator, Defendants have ensured that there is financial incentive to continue the arbitration.

      b.     Given the wholly one-sided nature of the forum and applicable law chosen by Defendants for the resolution of disputes and the fact that the forum and law are nonexistent and inapplicable to the illegal loan agreement, no consumer would have agreed to arbitrate questions of arbitrability if he or she had known that judicial review of the agreement would be limited.

      c.     Access to no discovery or very limited discovery in arbitration would foreclose the ability to challenge threshold issues such as the arbitrability of the dispute while still preserving discovery necessary to prosecute claims.

**D.  Western Sky is not a tribal entity, and Defendants' loan activities are not shielded by tribal sovereign immunity**

37.  Although Western Sky allegedly has an office located within the exterior

boundaries of the Cheyenne River Sioux Reservation, the Sioux Tribe has absolutely no

ownership interest in Western Sky, nor does the Tribe play any role in the operation of

Western Sky.  Western Sky is not a tribal enterprise or in any sense an entity formed by

or controlled by the Cheyenne River Sioux Tribe or its tribal government; and Western

Sky is not an arm of the Tribe.

38.  Instead, Western Sky is a for-profit limited liability company created

under South Dakota law.  The sole member of Western Sky is an individual named

Martin Webb.  Although Webb is a member of the Sioux Tribe, Webb is not a tribal

official or other representative of the Tribe's government.  Webb does not operate

Western Sky in any official tribal capacity.  Further, Western Sky does not operate in any

way for the benefit of the Tribe.  Instead, all profits made by Western Sky inure to the benefit of, and are distributed solely to, Webb.

39.     The Defendants employ what is known as "rent-a-tribe" scheme, in which the unlicensed lender -- CashCall -- makes usurious consumer loans, heedless of state regulation, by purporting to affiliate with an Indian tribe to claim federal tribal sovereign immunity.   Even the payday lending industry has decried "rend-a-tribe" lending as improper.  In February 2011, the Community Financial Services Association of America, a trade association which represents the payday lending industry, condemned the practice of affiliating with Indian tribes to circumvent state regulation and announced that it would expel members who engaged in such schemes.  *See,* Press Release, Community Financial Services Association of America, Storefront Payday Lenders Reject Native American Partnerships (Feb. 10, 2011).

40.     Notably, prior to entering into its current "rent-a-tribe" arrangement with Western Sky in late 2009, CashCall previously entered into an identical "rent-a-bank" arrangement with at least two state-chartered banks, one based in South Dakota and another in Delaware – states that have no usury laws and therefore no interest rate limitations – in an effort to circumvent state licensure and state law restrictions on consumer loans.  The State of West Virginia, which has usury laws, filed suit against CashCall in 2008, for making illegal loans to West Virginia consumers.  Following a trial, the West Virginia court agreed with the State, and found that "the purpose of the lending program was to allow CashCall to hide behind the Bank's charter and its right to export interest rates under federal banking law, as a means for CashCall to deliver its loan product to states like West Virginia with usury laws." *West Virginia v. CashCall, et al.* civil File No. 08-C-1964, Kanawha County Circuit Court, Final Order on Phase II of

the Trial; the State's Usury and Lending Claims, at 25.  The Court found that CashCall was the *de facto* lender of such loans and enjoined it from making loans in West Virginia without a license and from making or collecting on usurious loans, imposed a civil penalty of $730,000, awarded a judgment of $10,045,687, and declared all loans made by CashCall in West Virginia null and void.

41.   In addition to the State of West Virginia's action against CashCall, other states, took action against other illegal "rent-a-bank" payday lending schemes.  *See In re Advance America*, North Carolina Commissioner of Banks, Docket No. 05:008; *State of North Carolina ex rel. Cooper v. Ace Cash Express, Inc.,* No. 02-CVS-330 (Wake County Sup. Ct.).  These actions, together with warnings and enforcement actions by the Office of the Comptroller of the Currency ("OCC") and the Federal Deposit Insurance Corporation ("FDIC") at the federal level largely ended "rent-a-bank" or "rent-a-charter" schemes used by CashCall and other payday lenders or high interest rate installment lenders.  With the demise of the "rent-a-bank" scheme in the wake of federal and state enforcement actions, CashCall now partnered with Western Sky under a "rent-a-tribe" arrangement – thus, retaining the exact same business model as before of making unlicensed high interest rate loans.

**E.   CashCall and Delbert attempt to collect loans which they know are void and unenforceable.**

42.   After CashCall was immediately assigned a loan, it undertook all collection activity on the loans.

43.   Among other actions, CashCall:

    a.   Sent consumers billing statements that identified the amounts and dates of debits that CashCall would be extracting from the consumers' bank accounts through Automated Clearing House (ACH) transactions;

    b.      CashCall debited the loan payments from the consumers' bank accounts. Interest and other loan fees were typically a substantial part of each installment payment;

    c.      When consumers became delinquent or refused to pay further on the loans, CashCall demanded loan payments through repeated calls, letters, and other communications; and,

    d.      Reporting the loans as delinquent to Credit Reporting Agencies ("CRA's").

44.    Through its billing statements, ACH debits from consumer bank accounts, and dunning letters and other communications, CashCall expressly or impliedly represented that it was legally entitled to demand and receive all principal, interest, fees, and other charges associated with the "Western Sky" loans.

45.    CashCall initially hired Delbert to service CashCall's "charge-off" portfolio of Western Sky loans which consists of loans that are more than 150 days past due. Ultimately, Delbert serviced all of CashCall's loans.

46.    Like CashCall, after Delbert began servicing the loans, it continued all collection activities including:

    a.      Sending billing notices demanding repayment of the loans;

    b.      Collecting monthly installment payments;

    c.      Demanding full payment through repeated letters and other communications; and,

    d.      Reporting the loans as delinquent to CRAs.

47.    Neither CashCall nor Delbert disclosed that the loans were void under Kentucky law.

**F.**    **Reddam's control of the illegal loan scheme.**

48.    Reddam is the CEO, president, sole director, and sole owner of CashCall. Reddam has actively managed the activities of CashCall.

49.     Reddam also is the director and sole owner of Delbert.  In support of license applications for Delbert in at least two states, Reddam represented that he "r[an] the day-to-day operations of CashCall," that "[a]ll of the company's department heads report[ed] directly to [him]," that he was "responsible for devising and implementing all major company policies," and that "[h]e coordinate[d] all marketing and advertising, and determine[d] where advertising should be directed."

50.     Reddam is the president, manager, sole member, and sole owner of WS Funding, an entity created to fund and purchase the illegal loans from Western Sky.

51.     Reddam was involved in all aspects of structuring the illegal loan scheme. He created the relationship with Western Sky, formed WS Funding to funnel money to Western Sky, he set up CashCall to be the *de facto* lender and collector, and ultimately diverted collection to Delbert.

52.     Reddam conceived of and controlled the illegal loan scheme from beginning to end.

## G.     The Federal Trade Commission and numerous states have rejected the illegal loan scheme.

53.     The Federal Trade Commission ("FTC") initiated an action against Western Sky and other related companies in September 2011 in the District of South Dakota.  The FTC alleged that Western Sky violated the FTC Act, the FTC Trade Regulation Rule Concerning Credit Practices, and the Electronic Fund Transfer Act in connection with Western Sky's offering and extension of credit in the form of high-fee, short term loans, and the collection of those loans.  On April 4, 2014, Western Sky agreed to and consented to the entry of a Stipulated Order for Permanent Injunction and Civil Penalties.  Among other prohibitions, Western Sky was prohibited from:

        a.      Bringing any legal action on a debt against any consumer.

        b.      Conditioning the extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers.

54.    In addition to the Order issued by the New Hampshire Banking Commissioner, numerous other states have taken action against the illegal scheme for unlicensed lending activities and for violation of states' usury and consumer protection laws.  Each and every court or regulator that has addressed the claim that the loans are shielded from state laws under the doctrine of tribal sovereign immunity has rejected the claim.

55.    In a case brought by the State of Colorado, the Court granted the State's motion for summary judgment, holding that Webb, as an enrolled member of the Tribe, "is not individually entitled to immunity, nor does his membership in the Tribe confer such immunity upon Western Sky."  In addition to granting Colorado's motion for summary judgment, the Court ordered Western Sky to pay Colorado's attorneys' fees incurred in litigating the sovereign immunity issue.  *State of Colorado v. Western Sky Financial, LLC and martin A. Webb,* no. 11 CV 638 (State of Colorado, Denver County District Court, April 15, 2013).

56.    In a similar Opinion and Final Order issued on May 22, 2013, the Maryland Commissioner of Financial Regulation ordered Western Sky to cease and desist from making unlicensed loans in Maryland, from collecting on loans made to Maryland consumers, and to pay a civil penalty.  In issuing his Order, the Commissioner rejected Western Sky's defense of sovereign immunity, holding that it "is undisputed that tribal sovereign immunity does not protect individual tribal members."

*Commissioner v. Western Sky Financial et al.,* Case No. CFR-FY2011-182, OAH No. DLR-CFR-76A-47146 (May 22, 2013).

57.     Similarly, in a recent order issued by the Washington Department of Financial Institutions, the Hearing Officer held that Western Sky is not protected by tribal sovereign immunity.  (OAH Docket No. 2012-DFI-0027, DFI No. C-aa-0810-12-SC01, August 16, 2013).  In a previous order issued against CashCall in January 2013, the Department of Financial Institutions held that CashCall's Western Sky loans were subject to the State's usury law, stating: "CashCall failed to establish that federal Indian law insulated Western Sky and CashCall from Washington usury law when they reached into Washington and made loans to and transacted loans with Washington residents." Order at p. 6.  The order further required CashCall to cease and desist collecting usurious interest.   (*In the Matter of: CashCall, Inc.,* OAH Docket No. 2011-DFI-0041, DFI No. C-11-0701-12-SC03, January 30, 2013).

58.     In yet another recent ruling in an action brought by the Iowa Division of Banking against CashCall, an Administrative Law Judge held that Iowa law, not tribal law, applied to CashCall's Western Sky loans.  *In the Matter of: CashCall, Inc.,* DIA Nos. 12 IDB002, 131IDB001, IDOB Nos., 2012-NRR-2003-0154, 2012-NRR-2012-0099, Ruling On Whether Loans At Issue Are Subject to Iowa Law (September 26, 2013).

59.     In an earlier proceeding brought by the West Virginia Attorney General to enforce an administrative subpoena against Western Sky, the West Virginia Court held that Western Sky was not protected by the doctrine of tribal sovereign immunity.  *State of West Virginia v. Payday Loan Resource Center, LLC*, Kanawha County Circuit Court, West Virginia, NO. 10-MISC-372 (October 28, 20100).  The case was settled in 2012, with Webb promising to permanently stop lending in West Virginia and to pay

restitution of $135,000 for excess fees charged to borrowers.  West Virginia Attorney General, *In the Matter of: Payday Financial LLC d/b/a Lakota Cash and Martin A. Webb,* Assurance of Discontinuance (October 5, 2012).

60.     Other state regulators, including those in Illinois, Massachusetts, North Carolina, and Oregon have issued cease and desist orders to Western Sky and/or CashCall, ordering them to stop making or collecting upon loans in their respective states.

61.     As a result of these enforcement actions, Western Sky announced on its website that, as of September 3, 2013, it was suspending business operations.  Western Sky's announcement does not state the duration of this suspension, or whether this suspension is temporary or permanent.

62.     Notwithstanding Western Sky's announcement, CashCall and Delbert continue to collect on illegal loans made to Kentucky consumers, including servicing the loans, contacting Kentucky consumers, and demanding payment on the loans.

**H.**     **Plaintiff's dealings with Defendants**

63.     On July 24, 2012 Plaintiff entered into a Loan Agreement purporting to be made by Western Sky.

64.     Prior to the date of the loan, Plaintiff saw advertisements purportedly by Western Sky for loans.  These advertisements ran on television channels; specifically, channels related to horse racing.

65.     As a result of seeing these advertisements, Plaintiff called the advertised number and spoke to a representative.

66.     Plaintiff initially sought a loan of $5,000.  The representative encouraged Plaintiff to take a loan of $10,000 because the monthly payment, though higher, would not be proportionately higher than for a loan of $5,000.

67.     Plaintiff applied for and obtained a loan of $10,000 from his residence in Kentucky through phone calls to Defendants and by connection to Defendants' website.

68.     The Loan Agreement required Plaintiff to agree to electronic fund transfers from his personal checking account.

69.     The Loan Agreement purported to loan Plaintiff $10,000 at 89% per annum to be repaid with one payment of $197.78 and 84 monthly payments of $743.49. The total amount financed was $9,925.00 plus an origination fee of $75.00.  The total payments on the loan, if made as scheduled, totaled $62,650.94.

70.     Within days after entering onto the Consumer Loan Agreement, Plaintiff was advised that the loan had been assigned to CashCall.

71.     Plaintiff made payments totaling over $9,000 to Defendants on the loan through August 2013.  Plaintiff had to cancel his personal checking account to keep Defendants from attempting to deduct payments on the loan.

72.     After Plaintiff was no longer able to make payments on the loan, CashCall turned over collection of the loan to Delbert.

73.     On May 1, 2014, Delbert wrote to Plaintiff seeking to collect on the loan. In that communication, Delbert represented that the current balance of the loan was $16,842.03.

74.     Delbert was aware that CashCall, through Western Sky, had loaned Plaintiff, a Kentucky resident, the sum of $10,000 at an annual interest rate of 89% for 85 months.

# V. **CLASS CERTIFICATION**

75.     Pursuant to Rules 23(a), (b)(3), (b)(2) and (c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this class action on behalf of himself and all others similarly situated.  Specifically, Plaintiff seeks to represent the following persons ("the Class" or "Class Members"):

> All residents of the Commonwealth of Kentucky who entered into a Consumer Loan Agreement in which Western Sky Financial, LLC, purported to loan an amount equal to fifteen thousand dollars or less at a rate of interest greater than 8% per annum.

76.     Excluded from the Class are Defendants, their employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their Court staff, and Plaintiff's counsel.

77.     Members of the above-defined Class can be easily identified through Defendants' records.

## A.     **Numerosity**

78.     The proposed Class is so numerous that individual joinder of all Members is impracticable.

79.     The subject recall involves hundreds if not thousands of Class Members. While the identities of Class Members are unknown to Plaintiff at this time, such information can be readily ascertained through appropriate investigation and discovery. The disposition of the claims of the Class Members in a single action will provide substantial benefit to all parties and to the Court.

**B.     Predominance of Common Questions of Law and Fact**

80.     Common questions of law and fact exist as to all Members of the Class and predominate over any questions affecting only individual Class Members.   These common legal and factual questions include, but are not limited to, the following:

a.     Whether the loans violate the usury laws;

b.     Whether the loans are fraudulent;

c.     Whether the loans violate the Kentucky Consumer Protection Act;

d.     Whether the Delbert violated the Fair Debt Collection Practices Act;

e.     Whether Defendants engaged in unfair, deceptive, and unconscionable practices in connection with the loans;

f.     Whether, as a result of Defendants' illegal activities, Plaintiff and Class Members have suffered damages and, if so, the appropriate amount of such damages; and,

g.     Whether, as a result of Defendants' illegal activities, Plaintiff and Class Members are entitled to declaratory and injunctive relief, or other relief, and, if so, the nature of such relief.

81.     Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the Class as a whole.   In particular, Defendants have failed to adequately repair or replace the uniformly defective thermostats, as described herein.

**C.     Typicality**

82.     Plaintiff's claims are typical of the claims of the Members of the Class. Plaintiff shares the aforementioned facts and legal claims or questions with Class Members, and Plaintiff and all Class Members have been similarly affected by Defendants' common course of conduct of making illegal loans in the Commonwealth of Kentucky.

**D.**     **Adequacy**

83.     Plaintiff will fairly and adequately represent and protect the interests of the Class.   Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of financial and consumer protection litigation.

84.     Plaintiff and his counsel are committed to the vigorous prosecution of this action.

**E.**     **Superiority**

85.     A class action is superior to other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

   a.     The claims presented in this case predominate over any questions of law or fact affecting individual Class Members;

   b.     Individual joinder of all Class Members is impracticable;

   c.     Absent a Class, Plaintiff and Class Members will continue to suffer harm as a result of Defendants' unlawful conduct;

   d.     Given the amount of individual Class Members' claims, few, if any, Class Members could afford to, or would, seek legal redress for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

   e.     Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

   f.     Adjudications of individual Class Members' claims against Defendants would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may substantially impair or impede the ability of other Class Members to protect their interests; and,

   g.     This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused by Defendants.

86.     Defendants conceived of and implemented uniform procedures to place usurious loans which resulted in uniform damage to Plaintiff and Class Members.  As a result, Defendants have acted or refused to act on grounds generally applicable to each Class Member, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

87.     Because Plaintiff seeks injunctive and corresponding declaratory and equitable relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.  Further, bringing individual claims would overburden the courts and would be an inefficient method of resolving the dispute at the center of this litigation.

## VI. <u>CLAIMS</u>

## A.     <u>COUNT 1 – Violation of the Consumer Loan Act against All Defendants</u>

88.     Plaintiff incorporates, as if fully rewritten herein, the allegations of each of the preceding paragraphs.

89.     The loans made to Plaintiff and Class Members are not secured by a lien on real property.

90.     None of the Defendants are registered as a bank, credit union, finance company, or pawnbroker in the Commonwealth.

91.     Pursuant to KRS 286.4-420 no person shall, without first obtaining a license from the Commissioner, engage in the business of making loans in the amount or of the value of fifteen thousand dollars or less at a greater rate of interest, or consideration therefor than otherwise permitted by law.

92.     Defendants failed to obtain a license from the Commissioner.

93.     The maximum interest rate which may be charged by non-license holders is 8%.  KRS 360.010.  All the loans written by Defendants exceed 8%.

94.     KRS 286.4-991(1) makes any loan issued by an unlicensed lender which charges in excess of these rates void and Defendants have no right to collect any principal, charges or recompense whatsoever.

95.     The loans made to Plaintiff and Class Members are void and unenforceable.

**B.     <u>COUNT 2 – Violation of the Consumer Protection Act ("CPA") against All Defendants</u>**

96.     Plaintiff incorporates, as if fully rewritten herein, the allegations of each of the preceding paragraphs.

97.     Pursuant to Section 367.220(1) of the Kentucky CPA, Plaintiff and Class members are authorized to bring this civil suit to recover the actual damages sustained by them as a result of the unlawful acts of Defendants constituting violations of the CPA.

98.     Plaintiff's and Class members' participation in Defendants' unlawful loan scheme was for their own personal, family or household purposes within the meaning of the CPA - namely, providing for the economic security of their families.

99.     Defendants' unlawful loan scheme constitutes unfair, unconscionable, false, misleading and deceptive acts or practices in the conduct of trade or commerce in that, without limitation:

a.     Defendants knowingly charge illegal interest rates on loans.

b.     Defendants intentionally concocted a dispute resolution system which was intended to preclude Plaintiff and Class Members from obtaining relief for Defendants' unlawful loan scheme.

       c.     Defendants knowingly failed to register as a consumer loan company.

100.   As a direct and proximate result of Defendants' violation of the CPA, Plaintiff and Class members have suffered losses and damages in amounts in excess of the jurisdictional limits of this Court as may be determined by the trier of fact.

## C.   COUNT 3 – Fraud against All Defendants

101.   Plaintiff incorporates, as if fully rewritten herein, the allegations of each of the preceding paragraphs.

102.   CashCall made false representations concerning the loans, including;

       a.     That Western Sky was making the loans when, in fact, the loans were advertised, administered, and funded by CashCall.

       b.     That the loans were lawful and valid.

       c.     That CashCall had the legal right to collect payments on the loans.

       d.     That the loan was governed by Cheyenne River Sioux Tribe law and subject to tribal, jurisdiction and arbitration despite full knowledge that tribal law did not apply to the loan and that the Sioux Tribe had no tribal arbitration forum or rules and procedures.

       e.     That CashCall could ban claims filed in court and class action claims despite full knowledge that the arbitration provision was fraudulent and a sham.

103.   Plaintiff reasonably relied to his detriment on the misrepresentations because if CashCall had truthfully disclosed or caused to be disclosed that the loans were harmful and illegal, Plaintiff and Class Members never would have entered into a Consumer Loan Agreement. As a result of CashCall's fraud, Plaintiff and Class members have been harmed.

104.   As a direct and proximate result of Defendant's fraud, Plaintiff has been injured, and the Plaintiff is entitled to an award of monetary damages and declaratory and injunctive relief.

**D.     COUNT 4 – Violation of the Fair Debt Collection Practices Act ("FDCPA") against Delbert and CashCall**

105.    Plaintiff incorporates, as if fully rewritten herein, the allegations of each of the preceding paragraphs.

106.    Congress enacted the FDCPA 'to eliminate abusive debt collection practices by debt collectors.' 15 U.S.C. § 1692(e).  To effectuate this purpose, the FDCPA regulates interactions between consumers and debt collectors by imposing affirmative statutory obligations upon debt collectors and proscribing certain abusive conduct.

107.    Among other prohibitions, it is unlawful for debt collectors to make false or deceptive statements in the course of their collection activities.

108.    Whether a communication is false, misleading, or deceptive in violation of § 1692e is determined from the vantage of the "least sophisticated consumer."

109.    Delbert Services Corporation violated the FDCPA by, including but not limited to:

    a.    Attempting to collect a void loan in violation of 15 U.S.C. § 1692e, and 15 U.S.C. § 1692f.

    b.    Falsely representing the amount of the Western Sky consumer loan in communications to Plaintiff and Class Members and in negative credit information furnished to consumer credit reporting agencies in violation of 15 U.S.C. § 1692e.

110.    CashCall was an architect of the illegal Western Sky loan scheme.  As a result, CashCall had full knowledge of the illegal nature of the scheme and that the debts were void and invalid under Kentucky law.  CashCall and Delbert share interlocking ownership and control by Reddam.  Defendants were all fully aware that they were falsely representing the validity and collectability of the Western Sky loans.

111.    As a result of Defendants' violation of the FDCPA, Plaintiff and Class Members are entitled to recover damages, statutory damages, and costs of the action including reasonable attorney fees.

**E.      COUNT 5 – Injunctive Relief against All Defendants**

112.    Plaintiff incorporates, as if fully rewritten herein, the allegations of each of the preceding paragraphs.

113.    Class members and Kentucky consumers generally remain unaware that Defendants' loan scheme is illegal.

114.    Defendants are engaged in business activities, continuing in nature, instrumental to the carrying out of the ongoing criminal enterprises directed at Class members and Kentucky consumers generally.

115.    Defendants are in possession of and have control over funds belonging to Class members, obtained pursuant to void and illegal consumer loans.

116.    Defendants, on a continuing basis, are engaged in transferring Class members' funds outside the state of Kentucky and into accounts in California and potentially other states for purposes of obtaining payment on illegal loan transactions. Class members are generally unaware that transfers out of their account are illegal, that the interest rate is illegal, and that the loans are not owed.

117.    Class members and the general public will suffer continuing, immediate, and irreparable injury, absent the issuance of injunctive and equitable relief by this Court.

118.    Class members have no complete, speedy, and adequate remedy at law with respect to Defendants' continuing conduct.

119.    Preliminary and final injunctive relief is necessary to prevent further injury to Class members and to the general Kentucky public, including:

a.    An order enjoining Defendants from continuing to collect on the illegal Western Sky loans.

b.    An order enjoining Defendants from transferring Class members' funds from their accounts.

c.    An order that Defendants hold in trust, until further direction of this Court, all proceeds accepted or transferred from the accounts of Class members.

d.    An order directing that Defendants timely provide a complete accounting of:  i) the identities of each Class member; ii) the funds accepted or transferred from the accounts of each Class member; and iii) the identities of each person or entity to whom distributions of the funds of Plaintiff and Class Members have been made and the amounts of such distributions.

e.    A final order directing the disbursal of funds held in trust pursuant to order of this Court.

f.    An order enjoining each Defendant from engaging in further business activities violating the Consumer Loan Act or CPA.

**F.    <u>COUNT 6 – Civil Conspiracy against All Defendants</u>**

120.    Plaintiff incorporates, as if fully rewritten herein, the allegations of each of the preceding paragraphs.

121.    Defendants, and each of them, agreed to promote the unlawful loan scheme as alleged herein.

122. In furtherance of their conspiracy, Defendants conceived of and implemented a common scheme to engage in unfair and deceptive acts in violation of the Consumer Loan Act and CPA.

123. Defendants participated and furthered this conspiracy through their individual and concerted actions. Namely, Defendants acted in concert with each other and pursuant to a common design which conduct constitutes a violation of the Consumer Loan Act and the CPA; each Defendant knew that the other's conduct was unlawful and gave substantial assistance or encouragement to the other to so conduct itself; and, gave substantial assistance to the other in accomplishing a tortious result.

124. As a result of their agreement to act in concert, Defendants are jointly and severally responsible for the damage to Plaintiff and Class members.

125. As a direct result and proximate result of Defendants' agreement to promote the unlawful loan scheme, Plaintiff and Class Members were damaged thereby in an amount to be determined at trial.

**G.**   **Count 7 – Unjust Enrichment against All Defendants.**

126. Defendants knew that the loans issued to Plaintiff and Class Members were void and uncollectable in Kentucky because of their usurious interest rates and their failure to obtain a license to issue the loans.

127. Defendants intentionally concocted and implemented an unlawful and deceptive scheme to pass these loans off as valid and collectible.

128. As a result of Defendants' wrongful and fraudulent acts and omissions set forth above, Defendants obtained monies which rightfully belong to Plaintiff and Class Members.

129.   Defendants appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiff and the Class members who, without knowledge of the unlawful scheme, paid for illegal and uncollectible loans.

130.   It would be inequitable and unjust for Defendants to retain these wrongfully-obtained profits.  Furthermore, Defendants' retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

131.   Plaintiff and Class members would not have paid money to Defendants had they been aware of the unlawful and deceptive loan scheme.   Under the circumstances, it would be inequitable for Defendants to retain the benefit conferred without compensating Plaintiff and Class members.

132.   Plaintiff and Class Members request that this Court enter judgment in their favor for restitution of the profits and revenues unjustly obtained, plus interest.

## VII.  DEMAND FOR RELIEF

Plaintiff(s) therefore request(s) on behalf of himself/herself/itself/theirselves and the proposed Class, the following relief:

1.    An order certifying Class members' claims pursuant to Fed. R. Civ. P. 23(b)(3) and/or 23(b)(2), or certifying such issues as may be deemed appropriately treated on a class basis;

2.    An order appointing named Plaintiffs as representatives of the Class and appointing undersigned counsel as Class counsel;

3.    An order and decree issuing the preliminary and final injunctive relief demanded in this Complaint;

4.      An award of damages, jointly and severally, as against each Defendant, in an amount to be proven at the time of trial;

5.      An award of exemplary damages in the amount of three times the damages or loss suffered by each Class member;

6.      An award of prejudgment interest on liquidated damages;

7.      An award of attorney fees, including those provided for in Chapter 367;

8.      An award of litigation costs; and

9.      Such other declaratory or injunctive relief as the Court may deem fair and equitable.

### VIII.  JURY DEMAND

Plaintiff(s) demand(s) a trial by jury in this matter.

DATED this 9th day of November, 2015.

By: /s/ Robert R. Sparks
    Robert R. Sparks (Ky. Bar #83685)
    STRAUSS TROY CO., LPA
    150 East Fourth Street
    Cincinnati, Ohio 45202
    (513) 621-2120 Telephone
    (513) 241-8259 Facsimile
    rrsparks@strausstroy.com Email

    and

    /s/ Matthew T. Sanning
    Matthew T. Sanning
    224 Main Street
    Augusta, Kentucky  41002
    mattsanning@windstream.net Email

    *Attorneys for Plaintiff(s)*

4212485_1.doc